UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as Securities Intermediary, | **Case No.** |
| *Plaintiffs*, | **Judge.** |
| v. | |
| SUN LIFE ASSURANCE COMPANY OF CANADA, | |
| *Defendant*. | |

Plaintiff Wells Fargo Bank, National Association ("Wells Fargo"), as Securities Intermediary[1] ("Securities Intermediary" or "Plaintiff"), by and through its counsel, Hassett & Donnelly, P.C., and Lipsius-BenHaim Law, LLP (*pro hac vice* application pending), for its Complaint against defendant Sun Life Assurance Company of Canada ("Sun Life" or "Defendant"), states:

## THE PARTIES

1.      Wells Fargo is a national banking association with its main office in Sioux Falls, South Dakota.

2.      Sun Life is a Canadian life insurance company with its principal place of business located at One Sun Life Executive Park, Wellesley Hills, Massachusetts.

3.      Tiger Capital, LLC ("Tiger") is a New York limited liability company with its principal place of business in New York.

---

[1] Wells Fargo acts solely as Securities Intermediary for the beneficial owner of the life insurance policy at issue in this case, not in its individual capacity. *See U.C.C. § 8-102(a)(14)(ii)*

4.      Tiger is the successor in interest to AMT Capital Holdings S.A.

5.      Securities Intermediary maintains a securities account for the benefit of Tiger to which Securities Intermediary has credited life insurance policy number 020148679 (the "Kipust Policy" or the "Policy") issued by Sun-life.

6.      Securities Intermediary can exercise rights with respect to the Policy.

7.      Tiger has authorized and directed Securities Intermediary to file this lawsuit.

8.      Securities Intermediary is identified in the records of Sun Life as the owner and beneficiary of the Policy.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction in this case pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Securities Intermediary and Sun Life, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a), (b)(1), (b)(2) and (c)(2) because Sun Life resides in the Commonwealth of Massachusetts and because a substantial part of the events giving rise to the claims asserted occurred within this judicial district.

## FACTS

A.      **The Issuance of the Kipust Policy**

11.     On or about June 18, 2007, Sun Life issued the Kipust Policy insuring the life of Ruth Kipust, to the R. Kipust ILIT (the "Trust"). A copy of the Kipust Policy is attached herewith as Exhibit 1. A copy of the R. Kipust ILIT Trust Agreement is attached herewith as Exhibit 2.

12.     Philip Kipust was the trustee of the Trust at the time Sun Life issued the Kipust Policy

13.     The Kipust Policy has a face value of $10,000,000.

2

14.     Ruth Kipust was a New York resident at the time Sun Life issued the Kipust Policy and remains a New York resident to this date.

15.     Philip Kipust was a New York resident at the time Sun Life issued the Kipust Policy and remains a New York resident to this date.

16.     The Trust was at Policy inception a New York trust formed in New York pursuant to New York law.

17.     The broker who procured the Kipust Policy for the Trust was a New York resident.

18.     Sun Life's general agent who was involved in issuing the Kipust Policy was a New York resident.

19.     Thus, all of the parties except for Sun Life involved in the issuance of the Kipust Policy—the general agent, the broker, the insured, and the original owner of the policy—were New York residents.

20.     Sun Life issued the Kipust Policy from Wellesley Hills, Massachusetts.

21.     Sun Life has represented that it signed the Kipust Policy at Wellesley Hills, Massachusetts, on June 18, 2007.

22.     The application for the Kipust Policy consisted of two sections, each of which was separately executed.

23.     One section of the Kipust Policy's application purports to have been signed in New Jersey.

24.     The other section of the policy application was signed in New York, as it was signed in the presence of Sun Life's "[m]edical or paramedical examiner," which conducted Ruth Kipust's medical exam at her home in Brooklyn, New York.

B.      **Transfer of the Kipust Policy to AMT Capital**

25.     In early 2012, the Kipusts entered into negotiations to settle the Kipust Policy and sell it to AMT Capital.

26.     In the first quarter of 2012, the Kipusts, in connection with their intention to sell the Kipust Policy to AMT Capital, requested documentation from Sun Life necessary to facilitate the transfer of the policy.

27.     On February 6, 2012, February 17, 2012, and February 22, 2012, Sun Life sent letters to the Kipusts and/or their agents in New York that included the information that the Kipusts had requested.  Sun Life indicated the letters were sent from Wellesley Hills, Massachusetts.

28.     On April 2, 2012, Sun Life, in connection with the Kipusts' prospective sale of the policy to AMT Capital, sent a letter to Mr. Kipust in New York and attached a Verification of Coverage that, among other things, verified that the Kipust Policy was no longer contestable.

29.     Sun Life sent the Verification of Coverage to Mr. Kipust from Wellesley Hills, Massachusetts, its principal place of business.

30.     Sun Life sent the Verification of Coverage with the knowledge that the Kipust Policy's buyer—AMT Capital—would rely upon it in purchasing the Kipust Policy from the Trust.

31.     AMT Capital did rely upon Sun Life's Verification of Coverage when it purchased the Kipust Policy.

32.     On April 3, 2012, AMT Capital's agent in New York submitted a change of ownership form to Sun Life, along with related documents, to effectuate transfer of the Kipust Policy to AMT Capital.  Sun Life accepted and processed the change of ownership and, by letter to AMT Capital's agent in New York, confirmed the transfer.  Sun Life accepted and processed the change of ownership in Massachusetts, its principal place of business.

310504727.2

33.     On April 17, 2012, Sun Life wrote to AMT Capital in New York and advised that, on April 9, 2012, it had learned that Mr. Kipust alleged that his signatures were forged and that he did not authorize the policy sale.  Sun Life advised that its legal department would review the situation and advise on how to proceed.  Sun Life sent the letter from Massachusetts, its principal place of business.

34.     On April 19, 2012, Sun Life's attorneys wrote to AMT Capital in New York and to the Kipusts in New York and advised that a new change of ownership form would need to be submitted for Sun Life to process the change of ownership.

35.     On April 30, 2012, AMT Capital submitted new change of ownership forms to Sun Life at Sun Life's Massachusetts address.  Thereafter, Sun Life advised that it still would not process the change of ownership unless AMT Capital and the Kipusts scheduled an in-person closing for the sale of the policy at which a Sun Life representative could verify that the Kipusts procured and transferred the policy of their own volition.

36.     The live closing was held on June 1, 2012, in Brooklyn, New York.  An attorney representing Sun Life and an attorney representing AMT Capital attended the closing and witnessed the execution of the documents, facilitating the transfer.

37.     Following the live closing in New York, and in reliance upon Sun Life's actions in New York, AMT Capital took ownership of the Kipust Policy.

38.     AMT Capital paid $855,350 to acquire the Kipust Policy from the Trust.

39.     AMT Capital transferred the Policy to Securities Intermediary, in July 2017.

40.     Sun Life acknowledged, approved, and processed the change of ownership and beneficiary from AMT Capital to Securities Intermediary and recorded this change in its records. Sun Life acknowledged, approved, and processed the change of ownership in Massachusetts.

41.     In 2018, Tiger became the successor in interest of AMT Capital.

42.     By reason of the foregoing, the Kipust Policy is governed by New York Law.

43.     Sun Life has continuously delivered annual statements and illustrations to AMT Capital and/or Securities Intermediary which stated or represented that the Kipust Policy is valid and in force.  Sun Life has sent those documents to AMT Capital and Securities Intermediary from Massachusetts.

44.     Sun Life has sent premium notices relating to the Kipust Policy to AMT Capital and Securities Intermediary continuously since 2012 from Massachusetts.

45.     Sun Life has collected premiums on the Kipust Policy, from at least 2012 to the present, from Massachusetts.

46.     AMT Capital and Tiger, from their own accounts or through Securities Intermediary (collectively "Owner"), have paid premiums totaling $2,834,123.98 from 2012, when AMT Capital took possession of the Kipust Policy, through June 30, 2021.

47.     Owner continues to pay premium to Sun Life on a regular basis.

48.     The Kipust Policy is in good standing.

C.     **Sun Life's Assertion that the Policy *May* be Void**

49.     By letter dated August 18, 2016, eleven years after Sun Life issued the Kipust Policy and four years after Sun Life verified to AMT Capital that the policy was in force and no longer contestable, Sun Life informed AMT Capital that actually the Kipust Policy "was *likely* procured as a part of a stranger originated life insurance (STOLI) scheme" and that Sun Life believes that may have caused the Kipust Policy to "lack an insurable interest."  (Emphasis added.) Sun Life further indicated that this "likely renders the policy void."

50.     Sun Life sent the August 18, 2016 letter from Wellesley Hills, Massachusetts.

6

51.     The August 18, 2016, letter further stated that Sun Life had implemented procedures to detect STOLI policies ("STOLI Red Flags").

52.     In the August 18, 2016, letter, Sun Life reserved the right to void the Kipust Policy and to refuse to pay the Kipust Policy's death benefit upon its maturation.

53.     Sun Life has never provided any indication that it learned new information between 2012 and 2016 concerning alleged STOLI Red Flags in connection with the Kipust Policy that it did not have before it took part in AMT Capital's acquisition of the policy.

54.     Sun Life has not taken an affirmative position as to whether, upon maturity, it will honor the Kipust Policy's provisions and pay the policy's death benefit.

55.     After accepting Kipust Policy premium totaling $4,220,179.08, including Kipust Policy premium from AMT Capital and Tiger--from their own accounts or through Securities Intermediary--totaling $2,834,123.98, Sun Life refuses to state whether it will honor the Kipust Policy.

56.     Four years after confirming, prior to AMT Capital's purchase of the Kipust Policy, that the Kipust Policy remained in effect and was no longer contestable, and then directly participating in a live signing of documents facilitating AMT Capital's acquisition of the policy, and after having accepted subsequent premium payments totaling $1,063,534.86, Sun Life then informed AMT Capital for the first time that it was aware of "STOLI Red Flags" and actually believed that the Kipust Policy was **likely** void and unenforceable.

57.     Upon information and belief, Sun Life sent its August 18, 2016, letter to AMT Capital in an underhanded attempt to induce AMT Capital to stop paying premiums on the Kipust Policy, thereby allowing the Kipust Policy to lapse and Sun Life to retain all premiums paid on the policy.  AMT Capital, however, did no such thing.

7

58.     Sun Life continues to accept premium payments on the Kipust Policy.

59.     Following receipt of the August 18, 2016 letter, AMT Capital commenced suit against Sun Life in the Supreme Court of the State of New York.  The New York courts held, however, that they did not have personal jurisdiction over Sun Life.

60.     Meanwhile, Sun Life has trapped Plaintiff in an untenable, no-win position. Plaintiff must continue to pay premiums on the Kipust Policy, or Sun Life will lapse the policy for non-payment of premiums.  At the same time, Sun Life has revealed through its conduct in similar actions that it intends—upon maturation of the Kipust Policy—to both (a) deny any death claim on the Kipust Policy; and (b) bring suit seeking to rescind the Kipust Policy and retain all premiums paid on it.

**D.     Sun Life's Pattern and Practice of Inducing Policy Owners to Believe that Life Insurance Policies are Valid and Enforceable, Demanding Premiums for those Policies with the Intent Not to Honor Them, and Attempting to Rescind Those Policies After a Death Claim Is Submitted and to Keep All Premiums Paid on Those Policies**

61.     Sun Life has engaged in a pattern and practice of *not* challenging life insurance policies that it has issued and suspects to be illegal STOLI policies until a death claim is submitted. It does this in order to obtain and retain as much premium as possible before seeking to rescind the policies.

62.     Since at least 2007, Sun Life has sought to rescind life insurance policies that it issued on insurable interest grounds, and sought to retain all premiums paid for those policies, in the following lawsuits it has commenced:

| No. | Case Name | Case No. | Court |
|---|---|---|---|
| 1. | *Sun Life Assurance Company of Canada v. Wells Vargo Bank, N.A.* | 3:14-cv-05789 | U.S. District Court, District of New Jersey (Trenton) |
| 2. | *Sun Life Assurance Company of Canada v. Conestoga Trust Services, LLC (PLR1)* | 3:14-cv-00539 | U.S. District Court, Eastern District of Tennessee (Knoxville) |

8

| 3. | *Sun Life Assurance Company of Canada v. Advance Trust & Life Escrow Services, LTA, as Securities Intermediary* | 6:19-cv-00670 | U.S. District Court, Western District of Texas |
|---|---|---|---|
| 4. | *Sun Life Assurance Company of Canada v. Moldaw* | 4:09-cv-02631 | U.S. District Court, Northern District of California (Oakland) |
| 5. | *Sun Life Assurance Company of Canada v. U.S. Bank National Association* | 1:17-cv-00075 | U.S. District Court, District of Delaware (Wilmington) |
| 6. | *Sun Life Assurance Company of Canada v. U.S. Bank National Association* | 1:16-cv-01032 | U.S. District Court, District of Delaware (Wilmington) |
| 7. | *Sun Life Assurance Company of Canada v. U.S. Bank National Association* | 0:14-cv-62610 | U.S. District Court, Southern District of Florida (Ft. Lauderdale) |
| 8. | *Sun Life Assurance Company of Canada v. U.S. Bank National Association* | 1:17-cv-04545 | U.S. District Court, Northern District of Georgia (Atlanta) |
| 9. | *Sun Life Assurance Company of Canada v. Wells Fargo Bank, N.A.* | 1:20-cv-00779 | U.S. District Court, District of Delaware (Wilmington) |
| 10. | *Sun Life Assurance Company of Canada v. Wells Fargo Bank, N.A.* | 1:17-cv-06588 | U.S. District Court, Northern District of Illinois (Chicago) |
| 11. | *Sun Life Assurance Company of Canada v. Wells Fargo Bank, N.A.* | 3:17-cv-02679 | U.S. District Court, District of New Jersey (Trenton) |
| 12. | *Sun Life Assurance Company of Canada v. Wilmington Trust* | 2:15-cv-00758 | U.S. District Court, District of Utah (Central) |
| 13. | *U.S. Bank National Association v. Sun Life Assurance Company of Canada* | 3:14-cv-00562 | U.S. District Court, Western District of Wisconsin (Madison) |
| 14. | *U.S. Bank National Association v. Sun Life Assurance Company of Canada* | 2:14-cv-04703 | U.S. District Court, Eastern District of New York (Central Islip) |
| 15. | *Sun Life Assurance Company of Canada v. Wilmington Savings Fund Society, FSB, as Securities Intermediary and David Greenspahn* | N18C-08-074 | Delaware Superior Court, New Castle County |
| 16. | *Sun Life Assurance Company of Canada v. Wilmington Savings Fund Society, FSB, as Securities Intermediary and Sanford Schmidt* | N18C-07-289 | Delaware Superior Court, New Castle County |
| 17. | *Sun Life Assurance Company of Canada v. Wilmington Trust, N.A., as Securities Intermediary* | N17C-08-331 | Delaware Superior Court |

9

63.     This pattern and practice evidences Sun Life's intent with respect to the Kipust Policy.  Specifically, Sun Life has repeatedly represented to Owner, in writing, that the Kipust Policy is valid and enforceable; Sun Life has demanded premium payments to keep the Kipust Policy in force, under threat of terminating the Kipust Policy if premium payments are not timely made; and all the while, Sun Life has intended, planned, and schemed to deny any death claim on the Kipust Policy after the insured dies and, instead, upon policy maturity will commence a lawsuit to rescind the Kipust Policy on insurable interest grounds and to keep all of the premiums paid for the Kipust Policy.

64.     Sun Life's conduct in sending Owner annual statements, illustrations, and premium and lapse notices for years, each of which represented to Owner that Sun Life believed the Kipust Policy to be valid and enforceable, are past acts that were committed with the intent to induce Owner to believe that Sun Life considered the Kipust Policy to be valid and enforceable; to induce AMT Capital to acquire the Kipust Policy; and to induce Owner to continue paying premiums for the Kipust Policy.

65.     Sun Life's conduct in sending Owner multiple written communications indicating that Sun Life considered the Kipust Policy to be valid and enforceable was, in each instance, a deceptive trade practice, intended to deceive Owner into thinking that Sun Life considered the Kipust Policy to be valid and enforceable, and to trick Owner into thinking that it was paying premiums to keep a valid policy in force, and that the Kipust Policy would be honored by Sun Life upon maturity.

66.     When Sun Life sent each written communication to the Owner representing that it (Sun Life) considered the Kipust Policy to be valid and enforceable, it did so under false pretenses. Sun Life sent each of these written communications intending to induce AMT Capital to first

10

acquire the Kipust Policy and then to pay more and more premium for the Kipust Policy, all to illegitimately enrich Sun Life, as Sun Life never intended to honor the Kipust Policy. For years, based on Sun Life's insidious conduct, Sun Life has maneuvered to put the Owner in a "heads I [Sun Life] win, tails you [policy owner] lose" situation.

E.   **Owner Has Paid Sun Life Substantial Premiums to Keep the Kipust Policy In Force**

67.   AMT Capital paid $855,350 to acquire the Kipust Policy.

68.   Since acquiring the Kipust Policy, Owner has paid $2,834,123.98 in premiums to keep the policy in force.

69.   As recently as May 2021, Sun Life sent communication to Owner indicating that the Kipust Policy is in force, and demanding another premium payment from Owner, which, if not paid, would result in the termination of the Kipust Policy.

70.   Owner made continuing payment to Sun Life from 2012 to 2021. Sun Life has not returned any portion of that payment.

71.   Sun Life's demand that Owner continue to pay premium has been made, and will continue to be made, in bad faith, because, as evidenced by the lawsuits listed above, it is part of a pattern of practice in which Sun Life accepts policy premiums and then seeks rescission.

72.   Sun Life has been paid, and has accepted, $4,220,179.08 in premiums as of the date of this Complaint, all of which it intends to retain without honoring the Kipust Policy.

73.   Based upon past behaviour, Sun Life intends to demand additional premiums from Plaintiff in the future with no intention of honoring the Kipust Policy.

**FIRST CAUSE OF ACTION**
**DECLARATORY JUDGMENT**

74.   Plaintiff repeats and realleges each of the preceding paragraphs herein.

310504727.2

75.     An actual controversy presently exists between Plaintiff and Sun Life as to the validity of the Kipust Policy.

76.     The Kipust Policy, like most life insurance policies, has a resale value.

77.     As a result of Sun Life's August 18, 2016 letter, the resale value of the Kipust Policy has decreased.

78.     As a result of the numerous legal actions commenced by Sun Life against life insurance policy owners, the resale value of the Kipust Policy has decreased.

79.     Although Sun Life claims to have reserved its right to void the Kipust Policy, the Kipust Policy is incontestable for any reason other than the non-payment of premiums and therefore cannot be voided.

80.     The Kipust Policy did not lack insurable interest at issuance.

81.     The Kipust Policy is incontestable and cannot be voided because the Kipust Policy contained a provision, as mandated by law, which did not permit Sun Life to contest the Policy after it had been in effect for two years.

82.     The Kipust Policy cannot be voided on the ground that it lacked insurable interest at issuance.

83.     The Kipust Policy cannot be voided because Sun Life verified the enforceability of the policy and then accepted and retained premiums after it had gained knowledge of alleged STOLI Red Flags.

84.     Upon information and belief, Sun Life was aware of the STOLI Red Flags as early as Spring 2012.

85.     After Sun Life asserted in 2016 that the Kipust Policy was likely a STOLI policy, it continued to accept premiums to keep the Kipust Policy in effect.

12

86.     The Kipust Policy cannot be voided because Sun Life permitted the transfer of the Kipust Policy to AMT Capital while Sun Life had knowledge of the alleged STOLI Red Flags.

87.     The Kipust Policy cannot be voided because Sun Life permitted the transfer of the Kipust Policy to Securities Intermediary while Sun Life had knowledge of the alleged STOLI Red Flags.

88.     The Kipust Policy cannot be voided because Sun Life verified coverage to AMT Capital before title in the policy was transferred to AMT Capital.

89.     AMT Capital purchased the Kipust Policy specifically relying upon the confirmation of coverage furnished by Sun Life and, therefore, Sun Life cannot rescind the Kipust Policy.

90.     The Kipust Policy cannot be voided because Sun Life accepted and retained premiums after it had gained constructive knowledge of the alleged STOLI Red Flags.

91.     The Kipust Policy cannot be voided because Sun Life permitted the transfer of the Kipust Policy to AMT Capital while Sun Life had constructive knowledge of the alleged STOLI Red Flags.

92.     The Kipust Policy cannot be voided for any reason stated in the August 18, 2016 letter.

93.     The Kipust Policy cannot be voided for any reason.

94.     Nevertheless, Sun Life has demonstrated, both through its conduct in similar actions and in its August 18, 2016 letter, that it maintains that the Kipust Policy can be voided.

95.     An actual controversy exists between the parties as to whether or not the Kipust Policy can be voided.

13

96.     Plaintiff is entitled to declaration that (a) the Kipust Policy cannot be voided; (b) the Kipust Policy is in full force and effect; and (c) so long as premiums are paid as due on the Kipust Policy, Sun Life must pay the policy benefit upon maturity.

97.     In the alternative, if this Court were to conclude that the Kipust Policy is invalid, then the Court should declare that Sun Life must pay Plaintiff monetary damages, plus prejudgment interest, all in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**<u>PROMISSORY ESTOPPEL</u>**

98.     Plaintiff repeats and realleges each of the preceding paragraphs herein.

99.     Sun Life repeatedly promised Owner, both before and after Owner acquired the Kipust Policy, that the Kipust Policy is valid, enforceable, and no longer contestable.

100.    Sun Life repeatedly promised Owner, both before and after Owner acquired the Kipust Policy, that Sun Life will pay the policy's death benefit at policy maturity.

101.    Sun Life made these promises to Owner with the purpose of inducing Owner to rely upon them in acquiring the Kipust Policy.

102.    Sun Life made these promises to Owner with the purpose of inducing it to pay premiums on the Kipust Policy.

103.    Sun Life made these promises to Owner with the purpose of trapping it in a no-win situation as it must continue to pay premiums on the Kipust Policy, or Sun Life will cancel the policy for non-payment of premiums.  This would result in the loss of its entire investment in the policy; Sun Life would keep all premiums paid to date and never have to pay any policy benefits. At the same time, Sun Life intended and intends—upon maturation of the Kipust Policy—to both (a) deny any death claim on the Kipust Policy; and (b) bring suit seeking to rescind the Kipust Policy and retain all premiums paid on it.

14

104.    Owner reasonably relied upon Sun Life's promises in acquiring the Kipust Policy and in paying premiums to maintain it.

105.    Nevertheless, Sun Life was aware of alleged STOLI Red Flags that it believed caused the Kipust Policy to lack an insurable interest.

106.    Sun Life has no intention of paying the Kipust Policy's death benefit once the policy matures.  Sun Life instead intends to commence suit to rescind the Kipust Policy and will seek to retain all premiums paid on the Kipust Policy from the date of its inception until the date of its maturity.

107.    Owner has been damaged by its reliance upon Sun Life's false promises because it is now trapped in a situation where it must choose between either (a) investing further money into a policy that Sun Life will later attempt to void; or (b) ceasing to pay premiums on the policy and losing its entire investment to date.

108.    Owner has been damaged by its reliance upon Sun Life's false promises because it has been induced to pay premiums on the Kipust Policy that it would not have paid had it known of Sun Life's intentions.

109.    Owner has been damaged by its reliance upon Sun Life's false promises because those false promises have lowered the Kipust Policy's resale value.

110.    As such, Sun Life is estopped from seeking to void the Kipust Policy.

111.    In the alternative, if this Court were to conclude that the Kipust Policy is void, then Plaintiff is entitled to monetary damages, plus prejudgment interest, all in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### EQUITABLE ESTOPPEL

112.    Plaintiff repeats and realleges each of the preceding paragraphs herein.

15

113.   Sun Life repeatedly represented to Owner, both before and after Owner acquired the Kipust Policy, that the Kipust Policy is valid, enforceable, and no longer contestable.

114.   Sun Life repeatedly represented to Owner, both before and after Owner acquired the Kipust Policy, that Sun Life will pay the policy's death benefit once the policy matures.

115.   Sun Life made these promises to Owner with the purpose of inducing Owner to rely upon them in acquiring the Kipust Policy.

116.   Sun Life made these promises to Owner with the purpose of inducing it to pay premiums on the Kipust Policy.

117.   Sun Life made these promises to Owner with the purpose of trapping it in a no-win situation as it must continue to pay premiums on the Kipust Policy, or Sun Life will cancel the policy for non-payment of premiums.  This would result in the loss of its entire investment in the policy; Sun Life would keep all premiums paid to date and never have to pay any policy benefits. At the same time, Sun Life intended and intends—upon maturation of the Kipust Policy—to both (a) deny any death claim on the Kipust Policy; and (b) bring suit seeking to rescind the Kipust Policy and retain all premiums paid on it.

118.   Nevertheless, Sun Life was aware of alleged STOLI Red Flags that it believed caused the Kipust Policy to lack an insurable interest.

119.   Sun Life had no intention of paying the Kipust Policy's death benefit upon policy maturity.  Sun Life instead intended to and intends to commence suit to rescind the Kipust Policy and seek to retain all premiums paid on the Kipust Policy from the date of its inception until the date of its maturity.

120.   Owner did not know of any facts that would cause the Kipust Policy to lack insurable interest under New York law or the law of any jurisdiction.

310504727.2

121.    Owner did not know that Sun Life never intended to pay on the Kipust Policy.

122.    Owner did not know that Sun Life intended to void the Kipust Policy and retain all premiums paid thereon.

123.    Owner reasonably relied upon Sun Life's representations in acquiring the Kipust Policy and in paying premiums to maintain it.

124.    Owner has been damaged by its reliance upon Sun Life's misrepresentations because it is now trapped in a situation where it must choose between either (a) investing further money into a policy that Sun Life will later attempt to void; or (b) ceasing to pay premiums on the policy and losing its entire investment to date.

125.    Owner has been damaged by its reliance upon Sun Life's misrepresentations because it has been induced to pay premiums on the Kipust Policy that it would not have paid had it had known of Sun Life's intentions.

126.    Owner has been damaged by its reliance upon Sun Life's misrepresentations because those misrepresentations have lowered the Kipust Policy's resale value.

127.    As such, Plaintiff respectfully seeks an order holding that Sun Life is equitably estopped from seeking to void the Kipust Policy.

128.    In the alternative, if this Court were to conclude that the Kipust Policy is void, then Plaintiff is entitled to monetary damages, plus prejudgment interest, all in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
## VIOLATION OF MASSACHUSETTS GENERAL LAWS CHAPTER 93A

129.    Plaintiff repeats and realleges each of the preceding paragraphs herein.

130.    In addition to the harm that Sun Life has inflicted and intends to inflict on Plaintiff by demanding premiums that it will refuse to return, Sun Life's ongoing pattern and practice of

17

filing suit in lieu of paying valid claims has rendered the Kipust Policy essentially valueless on the tertiary market, which is a highly competitive market for policies like the Kipust Policy.

131.   As set forth above, Sun Life has asserted that the Kipust Policy "was likely procured as a part of a stranger originated life insurance (STOLI) scheme" and that Sun Life believes this caused the Kipust Policy to "lack an insurable interest."  Sun Life has further explicitly reserved the right to void the Kipust Policy and to refuse to pay the Kipust Policy's death benefit upon its maturation.

132.   Based on Sun Life's recent pattern and practice of not challenging other life insurance policies that it issued and believed to be procured as part of an illegal STOLI scheme until a death claim has been submitted, and then seeking to retain all of the premiums paid for the policy in addition to rescission, it is clear that Sun Life embarked on a scheme of trying to collect and retain as much premium as possible on life insurance policies that it issued with no intention of honoring them following the deaths of the insureds.

133.   As noted in a Memorandum Opinion issued on May 17, 2019 in *Sun Life Assurance Company of Canada v. U.S. Bank National Association*, No. 1:17-cv-00075-LPS (D. Del.), wherein the court had determined that the subject life insurance policy was invalid but nevertheless allowed the policy owner's claims for unfair trade practices act violations under General Laws Chapter 93A and a theory of promissory estoppel to proceed to trial under circumstances identical to those at issue here:

> [T]he Court concludes that a reasonable factfinder could find that Sun Life engaged in an unfair and/or deceptive act in connection with its handling of this Policy. These conclusions arise from the Court's determination that, based on all the circumstances of the case, a reasonable jury could find that Sun Life unfairly, unethically, and unscrupulously misrepresented the state of the Policy to induce U.S. Bank . . . to continue making hundreds of thousands of dollars in premium payments, when, in fact (as a reasonable jury could find)

Sun Life had already determined that it would not honor the Policy. For the same reasons, a reasonable jury could find that Sun Life acted deceptively in making the statements it made, and thereby caused U.S. Bank to act differently than it otherwise would have. Even accepting, arguendo, that Sun Life had no affirmative obligation to disclose to U.S. Bank its internal beliefs and intent, Sun Life's internal beliefs and intent may still be relevant to the factual question of whether Sun Life made willful representations that constitute an unfair and/or deceptive act.

*       *       *

In the Court's view, it would not be unreasonable for the jury . . . to find that Sun Life had decided the Policy was STOLI and thereby void, and had further decided it would not honor the Policy, yet continued to make representations that the Policy was in "good standing." Essentially, the parties dispute whether it would be reasonable for a jury confronted with this evidence, and taking it all in the light most favorable to U.S. Bank, to find that Sun Life misrepresented the state of the Policy in an effort to induce U.S. Bank to continue paying premiums. While reasonable minds could well differ as to the reasonableness of such inference, this Court concludes that it would be reasonable for a jury to reach such a finding.

*Sun Life Assurance Company of Canada v. U.S. Bank National Association*, No. 1:17-cv-00075-LPS (D. Del.) (D.E. 251) (Mem. Opin.), at 4-7 (footnotes omitted).

134.    Following a six day jury trial in *Sun Life Assurance Company of Canada v. U.S. Bank National Association*, the jury found in favor of U.S. Bank on its promissory estoppel claim. The trial court subsequently denied Sun Life's post-trial motion challenging the verdict, concluding as follows: "The jury had ample evidence from which it could have reasonably found that Sun Life's promise to pay, if premiums continued to be paid, to have been reasonably certain and definite." *Sun Life Assurance Company of Canada v. U.S. Bank National Association*, No. 1:17-cv-00075-LPS (D. Del.) (D.E. 296) (Dec. 30, 2019 Mem. Order), at 4. As a result, the federal district court ordered that "U.S. Bank will be awarded restitution damages totaling $1,923,068 (the

total amount of premiums paid to Sun Life on the Sol Policy), plus prejudgment interest . . . ." *Id.* at 5.

135.    The same conduct that caused the federal court in *Sun Life Assurance Company of Canada v. U.S. Bank National Association* to allow U.S. Bank's Mass. G.L. c. 93A and promissory estoppel claims to go to the jury, exists here.

136.    Sun Life's practice of, inter alia, demanding that Owner make premium payments in connection with the Kipust Policy, while simultaneously planning to deny coverage under the Kipust Policy, constitutes an unfair and deceptive business practice in violation of G.L. c. 93A, Sections 2 and 11.

137.    Sun Life's unfair and deceptive business practices involve trade or commerce within the meaning of Chapter 93A.

138.    Sun Life's actions that constitute unfair or deceptive acts or practices occurred primarily and substantially within Massachusetts.

139.    Assuming *arguendo* that the Court were to conclude that Sun Life is, in the future, entitled to deny Plaintiff the death benefits available under the Kipust Policy, Sun Life's unfair and deceptive business practices will have caused a loss of money or property to Plaintiff measured, at a minimum, by the loss of use of the premiums that Owner has paid and the cost of acquisition of the policy, even if the Court were to conclude that those premiums must be repaid to Plaintiff.  Plaintiff also will have incurred substantial attorney's fees, costs, and expenses addressing Sun Life's unfair and deceptive business practices. If, alternatively, the Court were to conclude that Sun Life may deny Plaintiff the death benefits available under the Kipust Policy, and that Plaintiff is not entitled to be repaid premiums, Plaintiff will have suffered a loss of property or money measured by the premiums that Owner would not have paid had Sun Life not

310504727.2

engaged in its repeated pattern of representing that the Kipust Policy was in full force and effect and that Owner was required to pay the premiums to continue to maintain the Kipust Policy in effect. Owner would not have paid those premiums under such circumstances.

140.    Plaintiff has suffered the loss of money or property, and is entitled to monetary relief and double or treble damages under Chapter 93A, plus reasonable attorney's fees, costs, and expenses.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury for all issues that may be triable by jury in this action.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in its favor as follows:

A.  A declaration that the Kipust Policy is governed by New York law and is in full force and effect;

B.  A declaration that Sun Life is barred by the doctrine(s) of waiver, forfeiture, and/or estoppel from taking any action to challenge the validity of the Kipust Policy and/or to have the Kipust Policy declared void or voidable;

C.  Alternatively, an Order that if the Kipust Policy is not valid and Sun Life may avoid paying the death benefit under the Kipust Policy, Sun Life must pay to Plaintiff monetary damages in an amount to be determined at trial.

D.  An Order granting Plaintiff attorneys' fees, costs, expenses, and interest; and

E.  Such other and further relief that this Court may deem just and proper.

310504727.2

Respectfully submitted,

The Plaintiff,
WELLS FARGO BANK, N.A., AS
SECURITIES INTERMEDIARY,
By its attorneys,


/s/ Sarah B. Christie

David F. Hassett, Esquire BBO #544443
Sarah B. Christie, Esquire BBO #566833
Hassett & Donnelly, P.C.
446 Main Street, 12th Floor
Worcester, MA 01608
(508) 791-6287; F: (508) 791-2652
Email:  dhassett@hassettdonnelly.com
              schristie@hassettdonnellly.com

DATED: July 30, 2021


/s/ Ira S. Lipsius

Ira S. Lipsius, Esquire
*Pro Hac Vice Motion to be filed*
Lipsius-Benhaim Law LLP
80-02 Kew Gardens Road, Suite 1030
Kew Gardens, NY 11415
212-981-8440; F: 888-442-0284
Email: iral@lipsiuslaw.com

DATED: July 30, 2021

310504727.2